JEAN E. WILLIAMS, Acting Assistant Attorney General
U.S. Department of Justice
Environment and Natural Resources Division
SETH M. BARSKY, Section Chief
MEREDITH L. FLAX, Assistant Section Chief
SHAMPA A. PANDA, Trial Attorney
U.S. Department of Justice
Environment & Natural Resources Division
Wildlife & Marine Resources Section
Ben Franklin Station, P.O. Box 7611
Washington, D.C. 20044-7611
shampa.panda@usdoj.gov
Ph: 202-305-0431
Fax: 202-598-3799

*Attorneys for Federal Defendants*

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| WILDEARTH GUARDIANS, | ) | Case No. 2:19-cv-9473 |
| | ) | |
| Plaintiff, | ) | **FEDERAL DEFENDANTS'** |
| | ) | **COMBINED RESPONSE** |
| v. | ) | **TO PLAINTIFF'S MOTION** |
| | ) | **FOR SUMMARY** |
| | ) | **JUDGMENT AND** |
| SCOTT DE LA VEGA,[1] in his official | ) | **CROSS-MOTION FOR** |
| capacity as U.S. Secretary of the Interior, and | ) | **SUMMARY JUDGMENT** |
| UNITED STATES FISH AND WILDLIFE | ) | |
| SERVICE, | ) | Date:  June 7, 2021 |
| | ) | Time: 1:30 PM |
| Defendants. | ) | |

---

[1] Pursuant to Federal Rule of Civil Procedure 25(d), Scott de la Vega, Acting Secretary of the U.S. Department of the Interior, is automatically substituted for David Bernhardt.

# **TABLE OF CONTENTS**

PAGE

INTRODUCTION ...........................................................................................1

BACKGROUND.............................................................................................1

I.   Statutory and Regulatory Background........................................1

II.  Statement of Facts .....................................................................4

STANDARD OF REVIEW .............................................................................7

ARGUMENT ................................................................................................8

A.  The Service properly considered how stressors including climate change, invasive grasses, and wildfires would affect the Joshua Tree in accordance with the best available science standard of the ESA ........................................................9

1. Climate Change.....................................................................9

2. Wildfires ............................................................................ 15

B.  The Service's consideration of existing regulatory mechanisms was rational .... 20

C.  The Service's finding that *Y. brevifolia* is not threatened throughout a significant portion of its range is reasonable and supported by the record............................ 22

CONCLUSION ........................................................................................ 25

i

1

**TABLE OF AUTHORITIES**

2

CASES                                                                                           PAGE(S)

3

*Alaska Oil & Gas Ass'n v. Pritzker,*
4
    840 F.3d 671 (9th Cir. 2016) ........................................................................... 19

5

*Balt. Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.,*
6
    462 U.S. 87 (1983) ............................................................................................. 8

7

*Camp v. Pitts,*
    411 U.S. 138 (1973) ........................................................................................... 8

8

*Center for Biological Diversity v. Zinke,*
9
    868 F.3d 1054 (9th Cir. 2017) ......................................................................... 18

10

*Defenders of Wildlife v. Jewell,*
    176 F.Supp.3d 975 (D. Mont. 2016) ............................................................... 23

11

*Greater Yellowstone Coal., Inc. v. Servheen,*
12
    672 F. Supp. 2d 1105 (D. Mont. 2009) ........................................................... 21

13

*Kern County Farm Bureau v. Allen,*
    450 F.3d 1072 (9th Cir. 2006) ......................................................................... 20

14

*Kleppe v. Sierra Club,*
15
    427 U.S. 390 (1976) ......................................................................................... 19

16

*Marsh v. Or. Nat. Res. Council,*
17
    490 U.S. 360 (1989) ......................................................................................... 19

18

*Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mut. Auto. Ins. Co.,*
    463 U.S. 29 (1983) ........................................................................................... 25

19

*Nw. Coal for Alts. to Pesticides (NCAP) v. EPA,*
20
    544 F.3d 1043 (9th Cir. 2008) ......................................................................... 18

21

*Nw. Ecosystem All. v. U.S. Fish & Wildlife Serv.,*
22
    475 F.3d 1136 (9th Cir. 2007) ......................................................................... 19

23

*San Luis & Delta-Mendota Water Auth. v. Jewell,*
    747 F.3d 581 (9th Cir. 2014) ...............................................................18, 19, 20

24

*Trout Unlimited v. Lohn,*
25
    559 F.3d 946 (9th Cir. 2009) ........................................................................... 20

26

*United States v. Carlo Bianchi & Co.,*
27
    373 U.S. 709 (1963) ........................................................................................... 7

28

STATUTES

5 U.S.C. § 706 .................................................................................................. 8

5 U.S.C. § 706(2)(A) ........................................................................................ 8

16 U.S.C. § 1531(b) .......................................................................................... 2

16 U.S.C. § 1532(6) .......................................................................................... 2

16 U.S.C. § 1532(20) ..................................................................................... 2, 4

16 U.S.C. § 1533 ............................................................................................... 4

16 U.S.C. § 1533(a)(1) ................................................................................... 2, 3

16 U.S.C. § 1533(a)(1)(D) ............................................................................... 21

16 U.S.C. § 1533(b)(1)(A) ................................................................................ 4

16 U.S.C. § 1533(b)(3)(A) ................................................................................ 2

16 U.S.C. § 1533(b)(3)(B) ................................................................................ 3

16 U.S.C. § 1533(b)(3)(B)(ii) ........................................................................... 3

16 U.S.C. § 1533(b)(5)(A)(i) ............................................................................ 3

16 U.S.C. § 1533(b)(6)(A) ................................................................................ 3

REGULATIONS

50 C.F.R. § 402.01(b) ....................................................................................... 2

FEDERAL REGULATIONS

84 Fed. Reg. 41,694 (Aug. 15, 2019) ............................................................ 1, 5

# **INTRODUCTION**

The record before the Court fully supports the U.S. Fish and Wildlife Service's ("the Service") determination pursuant to Section 4 of the Endangered Species Act ("ESA") that listing the two species of Joshua Tree as threatened or endangered species is "not warranted." *See* 84 Fed. Reg. 41,694, (Aug. 15, 2019).  The Service thoroughly reviewed the best available scientific and commercial data on potential threats to the Joshua Tree and concluded that none of those threats, either individually or in combination, placed the species in danger of extinction, or made them likely to become in danger of extinction in the foreseeable future, throughout all or a significant portion of their ranges ("SPRs").  In doing so, the Service utilized its discretion to weigh available information and make its own informed decisions as to what constitutes the best scientific and commercial data available.  Plaintiff fails to carry its high burden of showing that these determinations were arbitrary or capricious.  The Court should enter summary judgment in favor of Defendants.

# **BACKGROUND**

## **I.    Statutory and Regulatory Background**

Congress enacted the ESA in 1973 "to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved, [and] to provide a program for the conservation of such endangered

species and threatened species[.]" 16 U.S.C. § 1531(b).  The ESA directs the Secretary[2] to determine which species should be listed as threatened or endangered.  *Id.* § 1533(a)(1).  An endangered species is one that "is in danger of extinction throughout all or a significant portion of its range." *Id.* § 1532(6).  A threatened species is one "likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range." *Id.* § 1532(20).

The "listing" of a species as endangered or threatened under ESA Section 4 may occur in one of two ways—either through a "petition process" or of the Service's own accord.  In the latter scenario, the Service initiates the listing of a species as threatened or endangered.  In the petition process, any interested person may petition the Service to list a species as threatened or endangered. *Id.* § 1533(b)(3)(A).

The petition process is described in detail in ESA Section 4(b)(3).  *Id.* § 1533(b)(3)(A).  "To the maximum extent practicable, within 90 days after receiving" a petition, the Service must "make a finding as to whether the petition presents substantial scientific or commercial information indicating that the petitioned action may be warranted." *Id.*  This finding is published in the Federal Register.  If the Service determines that a petition to list a species presents substantial information indicating that the listing "may be warranted," it promptly commences a status review of the species. *Id.*

---

[2]  The Secretary of the Department of the Interior has jurisdiction over the Joshua Tree. The Secretary has delegated his ESA responsibilities to the Service. *See* 50 C.F.R. § 402.01(b).

After engaging in a status review, within 12 months after receipt of the listing petition, the Service must make one of three findings—that the listing is "warranted," "not warranted," or "warranted but precluded" by other listing activity. 16 U.S.C. § 1533(b)(3)(B).  If the Service finds that the listing is not warranted, the Secretary publishes the finding in the Federal Register and no further action is required.

If the Service finds that the listing is warranted, it must promptly publish in the Federal Register "a general notice and the complete text" of a proposed rule to list the species.  *Id.* § 1533(b)(3)(B)(ii), (b)(5)(A)(i).  Within one year of the publication of the proposed rule, the Service must publish a final regulation placing the species on the endangered or threatened list, notice that the proposed rule is being withdrawn, or notice that, due to a substantial disagreement regarding the sufficiency or accuracy of the available data the Service is extending by up to six months the timeline for making the determination.  *Id.* § 1533(b)(6)(A).

Under ESA Section 4, a species may warrant listing because of any of the following five factors:

> (A) the present or threatened destruction, modification, or curtailment of its habitat or range; (B) overutilization for commercial, recreational, scientific, or educational purposes; (C) disease or predation; (D) the inadequacy of existing regulatory mechanisms; or (E) other natural or manmade factors affecting its continued existence.

*Id.* § 1533(a)(1).  A species warrants listing if it meets the definition of an endangered species at ESA Section 3(6) or the definition of a threatened species at section ESA

3

Section 3(20)—that is, if the species is "in danger of extinction throughout all or a significant portion of its range," or is "likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range." *Id.* §§ 1532(20), 1533. The Service makes this determination

> solely on the basis of the best scientific and commercial data available to him after conducting a review of the status of the species and after taking into account those efforts, if any, being made by any State or foreign nation, or any political subdivision of a State or foreign nation, to protect such species, whether by predator control, protection of habitat and food supply, or other conservation practices, within any area under its jurisdiction; or on the high seas.

§ 1533(b)(1)(A).

## II.   Statement of Facts

The Joshua Tree is made up of two genetically distinct species, *Yucca brevifolia* ("*Y. brevifolia*") and *Yucca jaegeriana* ("*Y. jaegeriana*"), each of which differs in vegetative and floral morphology and has its own yucca moth pollinator. Administrative Record ("AR") 006930, AR006970, AR012018. The Joshua Tree habitat occurs in a diverse array of five regions where temperature, soil type, geography, rainfall and vegetation widely vary. AR006981–86. Accordingly, it generally occurs in elevations between 600 to 2200 meters, AR006973, and areas that receive between 3.24 and 29.06 inches of annual rainfall, and can tolerate temperature ranges between 12 °F to 138 °F. AR006992. It occupies more than 12 million acres throughout the desert grasslands and shrub communities of the Mojave Desert, Great Basin Desert, and Sonoran

Desert, AR006973-75, AR006977-79, AR011755, approximately 78% of which is either owned or managed by federal or state agencies, which provide protections and limit habitat disturbance, AR006942-43, AR006977-79, AR007059, AR007942, AR008214.

On August 15, 2019, the Service determined that listing the Joshua Tree as threatened or endangered under the ESA was not warranted due to the species' long lifespan, large ranges and distributions—which are mostly found on federal lands where it is protected or managed for conservation—and its ability to occupy numerous ecological settings. 84 Fed. Reg. at 41,694, 41,697. In making its 12-month findings, the Service reviewed the best available scientific and commercial data and compiled the information in a Species Status Assessment Report ("SSA"). AR006957-7084.

In the SSA, the Service thoroughly analyzed potential current and future threats including wildfires, invasive plants, habitat loss, and climate change (including prolonged drought). AR007053-54 (*Y. brevifolia*), AR007066-68 (*Y. jaegeriana*).  To assess the species' potential future condition, the Service ran two increased temperature scenarios and determined that species expansion north and westward could potentially counteract projected southern range contractions, AR007040, and identified areas within the predicted southern range contraction where the Joshua Tree would continue to persist. AR007014.   It determined that in a majority of the

current range, where there have historically been long fire return intervals of 300 to 500 years, wildfires did not pose a significant threat to the species as a whole. AR007000-01, 007012-13.  While there are no standardized long-term demographic studies of the Joshua Tree range, the Service examined National Park Service surveys and other studies to determine that recent recruitment events of the Joshua Tree throughout the Mojave Desert have been documented.  AR006966–007022, AR007027.

Taking into account the information in the SSA, the Service then assessed whether these species are likely to become endangered within the foreseeable future throughout all or a significant portion of their ranges in a Species Status Review Form.  AR006927-53.  For purposes of its 12-month findings, the Service used 80 years as the timeframe for the "foreseeable future" based on the limitations of the existing projected climate models.  AR006949, AR007032.  It defined the phrase "significant portion of its range" based on the statutory text of the ESA and court opinions involving other listing decisions.  AR006950-52.  The Service determined that although individual trees could be impacted by threats including wildfire, climate change, and habitat loss, the threats to *Y. jaegeriana* were not likely to affect the species at a population or species level, and that there was no portion of the range where any threats were more concentrated at a "biologically meaningful" scale than in other portions of its range.  AR006951.  The Service did determine that the area along the

western edge of the southern population of *Y. brevifolia* would face biologically significant threats from wildfire and habitat loss from development, but that this area was not unique or biologically different from other areas supporting this population and was not significant as it was a "very small percentage" of the total area occupied by *Y. brevifolia* in its southern population.  AR006951-52.  Based on its review of the best available scientific and commercial information, the Service concluded that *Y. brevifolia* and *Y. jaegeriana* were not in danger of extinction or likely to become endangered within the foreseeable future throughout all or a significant portion of their ranges and so listing was not warranted.  AR006953.

On November 4, 2019, Plaintiff challenged the listing decision, alleging that the Service violated the ESA by failing to use the best available science in its determination. Both parties' motions for summary judgment are now before the Court.

## **STANDARD OF REVIEW**

The ESA contains no internal standard or scope of review, and so the default standard and scope set forth in the Administrative Procedure Act ("APA") applies. *See United States v. Carlo Bianchi & Co.*, 373 U.S. 709, 715 (1963) ("[I]n cases where Congress has simply provided for review, without setting forth the standards to be used or the procedures to be followed, this Court has held that consideration is to be confined to the administrative record and that no de novo proceeding may be held.")

(citations omitted). The APA states that a court may only set aside agency action that it finds is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). The Court's role "is simply to ensure that the agency has adequately considered and disclosed the environmental impact of its actions and that its decision is not arbitrary or capricious." *Balt. Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.* 462 U.S. 87, 97-98 (1983) (citation omitted). In addition, where, as here, an agency's technical expertise is involved, "a reviewing court must generally be at its most deferential." *Id.* at 103 (citations omitted). In accordance with the plain language of APA Section 706, judicial review is limited to the agency's administrative record. "[T]he reviewing court shall … hold unlawful and set aside agency action, findings, and conclusions found to be--(A) arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law… In making the foregoing determinations, the court shall review the *whole record or those parts of it cited by a party*." 5 U.S.C. § 706 (emphasis added). *See also Camp v. Pitts*, 411 U.S. 138, 142 (1973) ("[T]he focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court.").

## **ARGUMENT**

Plaintiff asks this court to second-guess the expertise of the Service in determining which methods and models to rely upon in making its 12-month findings. The Court should decline to do so. The record makes clear that, in accordance with

the ESA, the Service carefully and thoroughly considered the effects of multiple stressors independently and cumulatively in coming to its determination that listing the Joshua Tree was not warranted.

**A. The Service properly considered how stressors including climate change, invasive grasses, and wildfires would affect the Joshua Tree in accordance with the best available science standard of the ESA**

The Service's listing decision is supported by the best available science concerning threats from stressors including climate change, invasive grasses, and wildfires.

**1. Climate Change**

The Service thoroughly analyzed how climate change would affect the Joshua Tree. Admittedly, the Service did not use species distribution models ("SDMs") to evaluate extinction risk. But that is because it determined that existing models used limited Joshua Tree distribution data that could not be reliably extrapolated to predict future distribution across the entire range of the Joshua Tree and make a quantitative assessment of how suitable habitat for the Joshua Tree would change under future climate scenarios. AR007036. Additionally, range-wide demographic data to validate an SDM is not available. AR007019-20.

Furthermore, because successful establishment of new Joshua Tree seedlings happens only a few times in a century, studies make clear that short-term, demographic monitoring does not capture the time frame necessary to determine

viability of the species. AR008989 (Esque et al. (2015)); AR007986 (Comanor & Clark (2000) concluding that "[i]t appears that 20 years is not adequate time to appreciate the demographic changes of this species.")

The best scientific data that the Service did have showed that the Joshua Tree would not likely be adversely affected by climate change to the point that it would warrant listing.  For example, the record is replete with studies that show species survival could actually be enhanced in a future with elevated carbon dioxide levels.  *See e.g.*, AR009032-45 (Garfin et al. (2014) study demonstrating that seedlings for *Y. brevifolia* in elevated carbon dioxide conditions could tolerate temperatures as low as 10.58 °F); AR016161-84 (Notaro et al. (2012) study using a combined dynamic modeling and bioclimatic-envelope approach to show that projected climate changes would lead to a "robust range expansion" for *Y. brevifolia*); AR016120-28 (Huxman et al. (1998); increase in carbon dioxide that mirrored increased atmospheric carbon dioxide led to increased photosynthesis in *Y. brevifolia*); AR016841 (Polley et al. 2013; finding that elevated atmospheric carbon dioxide would stimulate plant growth and reduce effects of drying in warmer climate); AR007219-25 (Archer & Predick (2008); study that increase in atmospheric carbon dioxide could promote Joshua Tree seedling survival).

There are also scientific studies containing climate change modeling that show the resiliency of the Joshua Tree.  For example, Blatrix et al. (2013) mentions that

paleodistribution models and paleorecords indicate that in past cycles of glaciation, the interdependent Joshua Tree and its pollinating moths responded concomitantly in terms of population expansion and migration.  AR016058.  Likewise, Barrows and Murphy-Mariscal (2012) utilized climate change modeling to find strong seedling recruitment occurring in Joshua Tree National Park, AR007515, contradicting Plaintiff's unidimensional argument that Joshua Trees have an inability to reproduce and recruit in the face of climate change, Plaintiff's Motion for Summary Judgment & Supporting Memo ("Pl.'s Mot.") at 23.  Plaintiff also cites to Dole et al. (2003) as purported evidence that the species' slow dispersal rate will inhibit its ability to fill new habitat, Pl.'s Mot. at 6, but the study actually found possible range expansion due to projected increases in atmospheric carbon dioxide.  AR019635-44; *see also* AR009161-75 (Holmgren (2009); study using radiocarbon dated middens containing plant material to determine that Joshua Tree historically had a more expansive distribution, thus contradicting Plaintiff's assertion that Joshua Tree cannot colonize new habitats).  A 14-year period census on the age and population structure of *Y. brevifolia* in the northwestern Mojave Desert (Gilliland et al. (2006)) shows that the overall annual survival rate of the Joshua Tree was 0.992, with 50% of individuals surviving up to 89 years and 5% surviving up to 383 years.  AR009051.  That species census also found that the Joshua Tree had recruited young trees recently and established new trees frequently over the last century, AR009052, undermining

Plaintiff's assertion that all studies have found no new seedling establishment or recruitment.  Pl.'s Mot. 2.

Plaintiff attempts to frame Smith et al. (1983) as the sole study that the Service used as evidence for Joshua Tree temperature resilience, Pl.'s Mot. at 16-17, but the record demonstrates that the Service considered other studies related to temperature tolerance and noted that Smith et al. (1983) provided a data point indicative of the temperature range for the species.  AR006981-92.  Laboratory studies such as Smith et al. 1983 helped the Service paint a fuller view of the Joshua Tree's future viability.

This demonstrates the comprehensive approach that the Service took in analyzing the many scientific studies on the Joshua Tree.  In contrast, Plaintiff misleadingly simplifies the studies utilizing SDMs that it relies on for the bulk of its argument.

First, Plaintiff alleges that the Service "simply discounts" the climate modeling in Barrows and Murphy-Mariscal (2012), Pl.'s Mot. at 12, but even though the study only looks at one small portion of the Joshua Tree's range, the Service still clearly addressed the modeling in the 2012 study.  At multiple points in the record the Service discusses that the model finds reduced Joshua Tree survival, recruitment, and distribution. *See* AR007001 (noting the 90% projected decline in Joshua Tree distribution under the most extreme climate scenario modeled in Barrows and Murphy-Mariscal (2012), AR007014, AR007037.  Barrows and Murphy-Mariscal

(2012) also identified the climate refugia where Joshua Trees would persist and observed there was no climate-related mortality found among the Joshua Trees and considerable tree seedling recruitment.  AR007002, AR007507, AR007509, AR007515.  Notably, in his review of the SSA during the peer review process, Dr. Barrows himself described the SSA as a "comprehensive review of the known biology/ecology" of the Joshua Tree, and encouraged the Service to give greater consideration to data that ran contrary to Plaintiff's position that Dr. Barrows' modeling supports finding a greater level of threat to the species.  Dr. Barrows noted that the SSA omitted data from his 2012 paper showing that Joshua Trees could persist in the southern portion of its range, and explained that recent research in that southern range corroborated his 2012 findings.  AR007507, AR021521.

Second, Plaintiff points to Notaro et al. (2012) as an example of a study that shows the "myriad ways" that climate change detrimentally affects the Joshua Tree. Pl.'s Mot. 5.  But climate change projections in Notaro's study actually led to a "robust range expansion" for *Y. brevifolia.*  AR016174. Similarly, Plaintiff relies on Shafer et al. (2001) as a study that uses climate change models that assume a 1% annual increase in greenhouse gases as one that shows complete extirpation of the Joshua Tree in its range.  Pl.'s Mot. at 11.  But a closer look demonstrates that the study shows significant expansion north and westward with increasing temperatures, and contraction only in the southern and central range.  AR016600-16.

Third, Plaintiff discusses at some length the Service's decision to omit from the SSA a non-peer-reviewed abstract Cornett presented at a 2014 symposium. Pl.'s Mot. at 23. But in the final SSA the Service cited Cornett (2017), a draft paper by that same author, to indicate that adult Joshua Trees are more likely to withstand drought periods than non-reproducing Joshua Trees. AR006991. Notably, the Cornett (2017) study looks at 10 one-hectare sites across the Joshua Tree range and *includes* the information presented in the Cornett (2014) symposium paper, which was confined to a one-hectare site in the Lost Horse Valley of Joshua Tree National Park. AR008170. Also notable is that the Cornett (2017) study discusses the use of SDMs and states clearly that "to date no empirical data has been presented supporting or rejecting the efficacy of the models," *id.*, further supporting the Service's decision not to rely on these models.

Throughout its brief, Plaintiff seizes upon the comments by peer reviewer Dr. Smith to argue that the Service ignored the effects of climate change on successful germination and recruitment. Pl.'s Mot. at 21-22. Plaintiff's argument is unavailing. As a threshold matter, Dr. Smith is an evolutionary biologist who has not constructed his own SDM for Joshua Tree, but criticized the Service for not incorporating other researchers' SDMs. AR021813. Scientists who are experts in SDMs such as Dr. Loik, AR005217-21, and Dr. Barrows, AR005128, were also peer reviewers on the SSA but did not voice the same concerns as Dr. Smith about the predictive distribution models

used.  Therefore, to the extent the Service disagreed with Dr. Smith's comments regarding the appropriateness of using SDMs, it was entirely reasonable.

### 2. Wildfires

Regarding the threat of wildfires, Plaintiff states that, "The record evidence shows fire has already burned large swaths of Joshua tree habitat," and that this "negative" trend would "continue throughout a significant portion of the Joshua Tree's range." Pl.'s Mot. at 18.  But studies do not support this argument that Joshua Tree populations are currently in decline, or will be, because of an increase in fire size and frequency.[3]  For example, Defalco and Esque 2010, which Plaintiff relies on to argue that the Service "dismissed and downplayed" threats from wildfire, concludes that adult trees showed fire resiliency by resprouting in burned areas and that, as a result, the Joshua Tree could "quickly re-establish as productive adults." AR008197-98.  Plaintiff also uses Defalco and Esque 2010 to argue that wildfires will kill all size classes of *Y. brevifolia*, Pl.'s Mot. at 18.  However, that study examined fire resiliency only in adult Joshua Trees.  AR008197-98.  It therefore cannot be used, as Plaintiff

---

[3] Plaintiff paints as "very troubling" the "inexplicabl[e]" and "dramati[c]" decrease from the draft SSA to the final SSA of the amount of Joshua Tree habitat that the Service classified as moderate to high risk of invasive grass cover.  Pl.'s Mot. at 20.  In the SSA, the Service used data from the Bureau of Land Management's Mojave Basin and Range Rapid Ecoregional Assessment that models the potential abundance of invasive grass within Joshua Tree populations to assist in projecting future habitat conditions associated with future fire frequencies for Joshua Tree.  AR007034.  While there was an error in the process used to calculate the percentage of Joshua Tree population acres within each invasive grass cover in the initial SSA, the final SSA includes the correct numbers. *See* AR003022.

attempts to, as support for the assertion that wildfires mean that the Joshua Tree population as a whole will shift to older, taller trees with reduced recruitment, Pl.'s Mot. at 22-23.  Similarly, Brooks and Matchett (2006), which Plaintiff uses as evidence of a new fire regime, only made predictions of wildfire based on available data from 1980–2004, a period of high drought and frequent wildfires.  AR007845-61.  Brooks and Matchett (2006) is also an example of the conflicting scientific information that the Service delved into in making its 12-month findings: while Cornett (2014) found that there was no new recruitment in its one-hectare study area, AR016091-94, Brooks and Matchett (2006) found evidence of recruitment, AR007845-61.

By the same token, Plaintiff relies on the assessment in Comer et al. 2013 to argue that the Service made an "about face" on the threat of invasive grasses and wildfire, Pl.'s Mot. at 19, but fail to note the study's own acknowledgement of the high unreliability of fire projections and that fire projections do not predict dramatic changes in current fire regimes from now to 2060.  AR008116.  The models in Comer et al. (2013) also project a range expansion in the north and western range of the Joshua Tree, AR008136, belying Plaintiff's reliance on it to show only range contractions, Pl.'s Mot. at 5.

Plaintiff's argument that the Service "dismissed critical feedback from . . . sister federal agencies," *see* Pl.'s Mot. at 1, is belied by the reports themselves.  For example, a 2003 U.S. Geological Survey study used repeat photography of burned and

16

unburned study areas in a Nevada test site to demonstrate that Joshua Trees are a relatively fast-growing and medium-lived species, thereby showing that wildfires do not necessarily lead to widespread mortality of Joshua Trees.  AR014359; *see also* AR014298-307 (United States Air Force study on Joshua Tree survivorship using light detection and ranging data, photogrammetry analysis, and geographic information system analysis indicated that over a 25-year period, severe burn stressors did not diminish the Joshua Tree populations on Edwards Air Force Base).

The preceding discussion is but a smattering of the thousands of pages of complex, often conflicting, scientific studies, peer review comments, and public input from other state and federal agencies that the Service sifted through in making its 12-month findings.  Instead of acknowledging this complexity, Plaintiff advances misleading generalizations in its argument about those studies.  *See e.g.* Pl's Mot. at 22 (citing to Esque et al. (2015) as evidence that using current distribution to identify suitable habitat for the species is inappropriate because long-lived as Joshua Tree adults may mask climate change effects, but the study had a sample size of 53 pre-reproductive *Y. brevifolia* in one study area of Yucca Flat, Nevada); *Id.* at 14 (contending that the SDMs, ecological niche models, and finer scale data all reached similar results, even though one study found that fine scale climate refugia remained in Joshua Tree National Park (Barrows and Murphy-Mariscal (2012)), another study found that there was a large contraction in Joshua Tree National Park (Cole et al.

2011), and still another study found that there was robust range expansion with increased atmospheric carbon dioxide (Dole et al. 2003)).

Ultimately, while the varying types of modeling that the Service analyzed in making its 12-month findings are complex, the record makes clear that the Service evaluated the impacts from the many threats facing the Joshua Tree as well as the synergistic impacts of those threats whenever there was sufficient data available to draw conclusions. *See* AR007049 (table outlining examples of potential synergistic effects including habitat loss, climate change, and invasive grass cover and altered fire return interval). It is when the agency is "choosing between various scientific models" that "deference to agency determinations is at its greatest." *San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 610 (9th Cir. 2014) (citing *Nw. Coal for Alts. to Pesticides (NCAP) v. EPA*, 544 F.3d 1043, 1050 (9th Cir. 2008)).

*Center for Biological Diversity v. Zinke*, 868 F.3d 1054 (9th Cir. 2017) is instructive. There, the Court rejected the plaintiff's allegation that the Service had "ignored climate change as a factor," and held that the Service had "directly addressed climate change" in finding that climate change was not a "significant threat" to the Sonoran Desert Area Bald Eagle due to its high adaptability, which the Service concluded would allow the eagle to "continue to exist even under some of the possible effects from climate change." *Id.* at 1062 (citation omitted). In *Zinke*, the Ninth Circuit made clear that it "must defer to the [Service's] interpretation of complex scientific

data." *Id.* at 1061 (citing *Nw. Ecosystem All. v. U.S. Fish & Wildlife Serv.*, 475 F.3d 1136, 1150 (9th Cir. 2007)).

Here, the Service clearly explains why it chose to rely on certain climate change studies rather than those containing the SDMs that Plaintiff favors.  "Because analysis of the relevant documents 'requires a high level of technical expertise,' [the Court] must defer to 'the informed discretion of the responsible federal agencies.'" *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 377 (1989) (quoting *Kleppe v. Sierra Club*, 427 U.S. 390, 412 (1976)); *see also San Luis*, 747 F.3d at 618 (the Fish and Wildlife Service's choice of which water flow model to use where "no superior set of models have been identified" was a 'scientific determination' . . . that 'requires a high level of technical expertise,' and so the court "must be at [its] most deferential in reviewing" the agency decision based on the models) (citations omitted).  What is before the Court is the Service's expert interpretation of multiple methodologies to determine the effects of climate change to the Joshua Tree.  Plaintiff refuses to defer to the Service's determination of which studies and models to use, even though such a decision is "well within [the Service's] discretion."  *San Luis*, 747 F.3d at 610.   Indeed, this is exactly the type of case where a high degree of deference is afforded to the agency. *See Alaska Oil & Gas Ass'n v. Pritzker*, 840 F.3d 671, 679 (9th Cir. 2016) (Ninth Circuit stressing that the court "'must defer to the agency's interpretation of complex scientific data' so long as the agency provides a reasonable explanation for adopting

its approach and discloses the limitations of that approach."); *San Luis*, 747 F.3d at 619 (finding that Fish and Wildlife Service adequately explained why it chose certain models and their possible limitations) (citation omitted); *Trout Unlimited v. Lohn*, 559 F.3d 946, 959 (9th Cir. 2009) ("[a]ssessing a species' likelihood of extinction involves a great deal of predictive judgment . . . entitled to particularly deferential review," and an agency is "entitled to decide between conflicting scientific evidence.") (citations omitted).  In *Kern County Farm Bureau v. Allen*, 450 F.3d 1072, 1080 (9th Cir. 2006), the Ninth Circuit made clear that the "best available data requirement 'merely prohibits [an agency] from disregarding available scientific evidence that is in some way better than the evidence [it] relies on'" and that the Service satisfied its duty under the best available science standard where it "thoroughly evaluated and incorporated the data" from contrary studies in "making its listing decision."  *Id.* at 1080-81(alterations in original) (citation omitted).  That is what the Service did in making these 12-month findings, and the Court should uphold its determinations.

The Court should reject Plaintiff's improper attempt to transform this case into a "battle of the experts," and uphold the Service's listing decision as one that articulates a rational connection between the facts found and the choice made and is supported by best available science.

**B. The Service's consideration of existing regulatory mechanisms was rational**

The Service rationally determined the Joshua Tree did not warrant listing due to the inadequacy of existing regulatory mechanisms surrounding climate change. The ESA requires the Service to determine whether a species is threatened or endangered based, in part, on "the inadequacy of existing regulatory mechanisms." 16 U.S.C. § 1533(a)(1)(D). The inadequacy of existing regulations cannot be determined in isolation, but must be evaluated against the extent and nature of threats facing the species. *Greater Yellowstone Coal., Inc. v. Servheen*, 672 F. Supp. 2d 1105, 1113 (D. Mont. 2009) ("When considering the inadequacy of existing regulatory mechanisms in the context of a petition to list a species, the question is whether the existing regulatory mechanisms are inadequate to prevent a species that is presumably decreasing in population from becoming threatened, endangered, or even extinct") *aff'd in part, rev'd in part and remanded* 665 F.3d 1015 (9th Cir. 2011).

Here, the Service discussed the regulatory mechanisms affecting the Joshua Tree, evaluating those mechanisms across multiple states as well as federal and state agencies. AR006942-43. The Service concluded that regulatory mechanisms exist and provide substantial regulatory protections and some conservation benefits to the Joshua Tree and its habitat range wide. *Id.* Plaintiff's only attack on the Service's consideration of regulatory mechanisms is that the Service allegedly failed to address regulations pertaining to climate change. *See* Pl.'s Mot. at 25. But existing regulations can only be inadequate where they are insufficient to militate a species' slide to

extinction.  Here, the Service concluded in its individual evaluation of each factor, and in its evaluation of the cumulative impacts of all potential threats, that no data indicated such a slide was occurring for the Joshua Tree.  AR006927-54.  Since that conclusion is rational and supported by the record—and Plaintiff has offered no persuasive arguments to the contrary—the regulatory mechanisms at issue cannot be "inadequate" to prevent the species from sliding towards extinction. The Service's consideration of regulatory mechanisms was therefore lawful.

### C.  The Service's finding that *Y. brevifolia* is not threatened throughout a significant portion of its range is reasonable and supported by the record.

After determining that *Y. brevifolia* is not endangered or threatened throughout its range, the Service then considered whether *Y. brevifolia* may be endangered or threatened in a significant portion of its range ("SPR").  To determine if the species faced a greater level of imperilment in any portion of its range, the Service considered whether the threats analyzed and addressed in its range-wide analysis, including climate change, reduced recruitment, wildfires, and habitat loss, are geographically concentrated in any portions of the species' range at a biologically meaningful scale. AR06951-52.  The Service identified only one portion along the western edge of the southern population of *Y. brevifolia* that may be experiencing a concentration of threats related to wildfire and urban development and evaluated whether listing *Y. brevifolia* is warranted based on threats to that portion of its range.  Ultimately, the

Service concluded that this area was not significant to *Y. brevifolia's* range as it was not unique or biologically different than other areas supporting the southern population and it constitutes a "very small percentage" of the total area occupied by *Y. brevifolia* in its southern population. *Id.* The Service did not specifically address other threats in the SPR analysis, such as climate change and reduced recruitment, because it found that other threats are impacting *Y. brevifolia* in an essentially uniform manner throughout the remainder of the range, including in the rest of the range of the southern population. *Id.* Plaintiff's contentions that the Service failed to adequately consider threats of habitat loss, reduced recruitment, wildfire, and urban development in this area, as well as in the range of the southern population and the species' entire range, Pl.'s Mot. at 24-25, are meritless.

At bottom, Plaintiff's primary argument is that because the Service allegedly failed to consider these threats in its range-wide determination, the Service necessarily failed to consider them in its SPR determination. This is what occurred in the case upon which Plaintiff primarily relies, *Defenders of Wildlife v. Jewell*, 176 F.Supp.3d 975 (D. Mont. 2016). Pl.'s Mot. at 24. In that case, the court held the Service's treatment of denning-scale effects of climate change on the wolverine was arbitrary and capricious. 176 F.Supp.3d at 1005. In later evaluating the plaintiffs' SPR analysis, the court said this same error "compels the agency to revisit its SPR analysis" because the analysis "proceeded from a flawed premise." *Id.* at 1007. Here, in contrast, for all the

reasons provided above, *supra* Sec. A, the Service more than adequately considered the identified threats to *Y. brevifolia* both range-wide and with respect to the species the southern population, including along the western edge.  Therefore, the Service's SPR analysis for *Y. brevifolia* is based on a thorough and reasonable consideration of the threats to *Y. brevifolia*.

Plaintiffs also allege that the predicted habitat loss within the southern population of *Y. brevifolia*, by itself, may represent an SPR for the species, Pl.'s Mot. 25, and in doing so overstate the impact of potential habitat loss for *Y. brevifolia*. While the potential habitat loss in the southern population of *Y. brevifolia* is projected at 21.7% (Scenario I) and 41.6% (Scenario II), those numbers represent projected potential losses of approximately 13% and 26%, respectively, of *Y. brevifolia's* total range. AR007047.  Furthermore, while Scenario II projects an up to 41.6% loss of habitat in the southern population of *Y. brevifolia*, that loss would occur *throughout* that area (totaling approximately 3.7 million acres)—and the Service determined that the concentration of threats related to wildfire and urban development was only in the perimeter of the current mapped distribution along the urban-wildland interface of the western edge of the southern population. AR007001, AR007050.  Thus, the Service's conclusion that the portion of the species' range facing a concentration of threats from wildfire and habitat loss is "a very small percentage" of the area occupied

24

by *Y. brevifolia* within its southern population is reasonable and supported by the record.  AR006952.

For all these reasons, Plaintiff's SPR argument fails.

## **CONCLUSION**

Plaintiff fails to demonstrate that the Service's determination is arbitrary and capricious as required under the applicable deferential standard of review.  *Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). The Court should defer to the Service's expertise with respect to the methodology it used to predict the effects of stressors including climate change, wildfires, and habitat loss on the species, uphold the Service's determination that listing the Joshua Tree under the ESA is not warranted, and grant summary judgment in favor of Federal Defendants and deny Plaintiff's cross-motion for summary judgment.

Dated:  March 12, 2021                              Respectfully submitted,

JEAN E. WILLIAMS
Deputy Assistant Attorney General
U.S. Department of Justice
Environment and Natural Resources Division
SETH M. BARSKY, Section Chief
MEREDITH FLAX, Assistant Section Chief
Wildlife and Marine Resources Section

 */s/ Shampa A. Panda*
SHAMPA A. PANDA, Trial Attorney
U.S. Department of Justice
Environment & Natural Resources Division
Wildlife & Marine Resources Section
Ben Franklin Station, P.O. Box 7611

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Washington, D.C. 20044-7611
shampa.panda@usdoj.gov

Ph: 202-305-0431
Fax: 202-598-3799

*Attorneys for Federal Defendants*

**CERTIFICATE OF SERVICE**

I hereby certify that on March 12, 2021, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which will send notification of this filing to the attorneys of record.

>/s/ Shampa A. Panda
>SHAMPA A. PANDA
>Trial Attorney
>United States Department of Justice
>Environment & Natural Resources Division
>Wildlife & Marine Resources Section
>P.O. Box 7611
>Washington, DC 20044-7611
>Tel: (202) 305-0431
>Fax: (202) 305-0275
>E-mail: shampa.panda@usdoj.gov
>
>*Attorney for Defendants*