O
JS-6

# United States District Court
# Central District of California

| | |
|---|---|
| WILDEARTH GUARDIANS,<br><br>    Plaintiff,<br><br>  v.<br><br>DEB HAALAND[1] & U.S. FISH & WILDLIFE SERVICE,<br><br>    Defendants. | Case № 2:19-cv-09473-ODW (KSx)<br><br>**ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT [42]; DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [46]; and GRANTING MOTION FOR LEAVE TO FILE AMICUS BRIEF [47]** |

## I.    INTRODUCTION

This Endangered Species Act ("ESA") case concerns the Joshua tree, an iconic succulent plant occurring almost exclusively in the Mojave Desert. Environmental non-profit WildEarth Guardians challenges the United States Fish and Wildlife Service's (the "Service") decision not to list the Joshua tree as threatened under the ESA ("12-Month Finding"). Guardians contends the decision is arbitrary, capricious, contrary to the best scientific and commercial data available, and otherwise not in accordance with the ESA. Guardians asks this Court to set aside and remand the 12-Month Finding for the Service to reconsider. (Guardians Mot. Summ. J.

---

[1] Pursuant to Federal Rule of Civil Procedure 25(d), Secretary of the Interior Deb Haaland is automatically substituted for former Secretary David Bernhardt.

("GMSJ"), ECF No. 42.) The Service asks the Court to find that the record fully supports the 12-Month Finding and that Guardians has failed to show the decision was arbitrary, capricious, or improper. (Serv. Mot. Summ. J. ("SMSJ"), ECF No. 46.) QuadState Local Governments Authority ("QuadState") moves for leave to file an amicus curiae brief in support of the Service's motion. (Mot., ECF No. 47.)

On August 2, 2021, the Court heard argument from the parties. Having considered the parties' papers and arguments, for the reasons below, the Court **GRANTS** Guardians's Motion for Summary Judgment (ECF No. 42), **DENIES** the Service's Motion for Summary Judgment (ECF No. 46), and **GRANTS** QuadState's Motion for Leave to File an Amicus Brief (ECF No. 47).

## II. THE ENDANGERED SPECIES ACT

The ESA "provide[s] a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved." 16 U.S.C. § 1531(b). The statute was designed to prioritize imperiled species to help them recover until federal protection is no longer needed. *See Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 174 (1978). "It represents a commitment to halt and reverse the trend toward species extinction, whatever the cost." *Id.* at 184 (internal quotation marks omitted).

The Secretary of the Interior is charged with protecting any "threatened" or "endangered" species, on her own initiative or in response to a petition from any "interested person." 16 U.S.C. § 1533(b)(3). "A species is endangered if it is 'in danger of extinction throughout all or a significant portion of its range,' and threatened if it is 'likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range.'" *Ctr. for Biological Diversity ("CBD") v. Haaland*, 998 F.3d 1061, 1063 (9th Cir. 2021) (citing 16 U.S.C. § 1532(6), (20)) ("*Haaland*"). The Service generally interprets "foreseeable future" to mean "the period through which it can reliably determine the threats to a species and the likely consequences." *Id.*

When the Secretary receives a petition, she must initially determine "whether it presents sufficient information to suggest that [an endangered or threatened] listing may be warranted." *Id.* at 1064 (citing 16 U.S.C. § 1533(b)(3)(A)). "If so, the Secretary must review the species' status and issue a '12-month finding' that listing is either (1) warranted, (2) not warranted, or (3) warranted but precluded by higher priority listing actions." *Id.* (citing 16 U.S.C. § 1533(b)(3)(B)). Listing a species as threatened or endangered triggers substantive and procedural protections under the ESA. *See* 16 U.S.C. §§ 1536, 1538. The Secretary has delegated authority to administer the Act to the Service. *Haaland*, 998 F.3d at 1064 (citing 50 C.F.R. § 402.01(b)).

### III. BACKGROUND

Guardians is a non-profit 501(c)(3) conservation organization focused on protecting and restoring the "wildlife, wild places, wild rivers, and health of the American West." (Compl. ¶ 13, ECF No. 1.) Guardians alleges that recent scientific studies show climate change and its associated effects, including drought, increasing wildfire, and habitat loss, pose a serious threat to Joshua trees' continued survival, and that these threats "are poised to eradicate Joshua trees from much of their current range by century's end." (*See id.* ¶ 4.) Accordingly, on September 28, 2015, Guardians filed a petition under the ESA requesting that the Service list the Joshua tree as a threatened species. (*Id.* ¶ 5.)

Joshua trees (*Yucca brevifolia* ("YBR") and *Yucca jaegeriana* ("YJA")) are long-lived succulent plants endemic to the Mojave Desert. (*Id.* ¶¶ 2, 25.) Their current range comprises approximately 12 million acres and extends from northwestern Arizona to southwestern Utah west to southern Nevada and southeastern California. (Admin. R. ("AR") 6927–53 ("Species Status Review Form" or "SSR") 6931–32, ECF No. 39.[2]) The Service recently determined that YBR and YJA are two

---

[2] The AR certification and index are filed at ECF No. 39 and the AR was lodged separately with the Court. (*See* AR00001–23731.)

distinct species, though they have long been known as a single species with two varieties and continue to be referred to together as "Joshua trees." (SSR6930.)

Joshua trees date back to the Pleistocene era, 2.5 million years ago. (Compl. ¶ 4.) They are characterized by infrequent germination, slow growth, and long lifespans (200–300 years). (*Id.* ¶ 31; SSR6934.) They reproduce sexually through pollination and seed production and asexually through rhizome growth, and take up to thirty years to reach sexual maturity. (Compl. ¶¶ 31–32.) Seeds go to Joshua trees' obligate pollinator, *Yucca moths*, and to seed scatter-hoarding rodents; seed dispersal is considered quite limited. (*Id.* ¶¶ 34, 35.) Seedlings are likely to emerge under shrub cover, or "nurse plants," and need periods of cool temperatures, yearly precipitation, and low herbivory to survive. (*Id.* ¶ 37.) Recent scientific studies indicate that these conditions align for successful new seedlings only a few times in a century. (*Id.* ¶ 40.)

On September 14, 2016, the Service issued a positive 90-day finding on Guardians's petition. 81 Fed. Reg. 63160–65 (Sept. 14, 2016) ("90-Day Finding"). The Service concluded that the petition presented substantial scientific and commercial information indicating that listing the Joshua tree as threatened may be warranted, based on ESA Factors A and E. (*Id.* at 63162; Compl. ¶ 54.) Factor A considers "[t]he present or threatened destruction, modification, or curtailment of its habitat or range," and Factor E considers "[o]ther natural or manmade factors affecting [the species'] continued existence." 16 U.S.C. § 1533(a)(1)(A), (E). The Service was to consider all five threat factors[3] in completing the Species Status Assessment Report ("SSA") and 12-Month Finding. 90-Day Finding at 63162.

Although the ESA requires that the 12-Month Finding "shall" be completed within 12 months of a petition, 16 U.S.C. § 1533(b)(3)(B), the Service published the Joshua tree SSA nearly two years later, in July 2018, (*see* AR6957–7084 ("SSA")) and

---

[3] The other three threat factors are: "(B) overutilization for commercial, recreational, scientific, or educational purposes; (C) disease or predation; [and] (D) the inadequacy of existing regulatory mechanisms." 16 U.S.C. § 1533(a)(1)(B)–(D).

1  issued the 12-Month Finding nearly three years later, in August 2019, 84 Fed.
2  Reg. 41694-01. In four short paragraphs, the Service determined that listing the
3  Joshua tree as threatened or endangered under the ESA was not warranted due to the
4  species' long lifespan, large ranges and distributions, and ability to occupy numerous
5  ecological settings. 12-Month Finding at 41697. The 12-Month Finding did not
6  discuss the statutory factors. *See id.* It incorporated the SSA by reference as
7  providing a "detailed discussion of the basis for this finding." *Id.* In October 2018,
8  the Service summarized the SSA in the SSR. (*See* SSR.)

9        In the SSA, the Service considered eighty years as the timeframe for the
10 "foreseeable future" and analyzed potential current and future threats, such as
11 wildfires, invasive plants, habitat loss, and climate change (including prolonged
12 drought). (*See* SSR6949; SSA7032, 7053–54 (YBR), 7054, 7066–68 (YJA).) The
13 Service recognized that Joshua trees' southern range suffered a greater concentration
14 of biologically meaningful threats, (SSR6951–52), but concluded that areas existed
15 within the predicted southern range contraction where the Joshua tree would persist,
16 (SSA7050–52), and found that potential expansion to the north and west could
17 compensate for the southern contraction, (*id.*). Although the Service found increased
18 fire risks from invasive grasses, and increased mortality and reduced survivorship of
19 individual Joshua trees from fire over time, it concluded that wildfires did not pose a
20 significant threat to the species. (SSA7000–01, 7012–13, 7032–35, 7055–57.) The
21 Service also noted that some studies indicated recent recruitment (new tree growth)
22 within the Mojave Desert. (*See* SSA7022, 7027.)

23       Specifically regarding the YBR, the Service found that the western edge of its
24 southern population would face "biologically significant threats from wildfire and
25 habitat loss from development," (SMSJ 7), but concluded this area was not a
26 "significant portion of its range," and thus did not warrant listing, (SSR6951–52). As
27 to the YJA, the Service found that individual trees could be impacted by threats from
28 wildfire, climate change, and habitat loss, but concluded the species would not likely

be affected at the population or species level. (SSR6951.) Thus, the Service concluded that Joshua trees were "not in danger of extinction nor likely to become endangered within the foreseeable future throughout all or a significant portion of" their range and, therefore, listing was not warranted. (SSR6953).

On November 4, 2019, Guardians filed this action challenging the 12-Month Finding. (*See* Compl.) Guardians challenges the Service's non-listing determination as violating the ESA in three ways: (1) the finding that Joshua trees are not threatened under the five threat factors is arbitrary and capricious; (2) the finding that Joshua trees are not threatened throughout a significant portion of their range is arbitrary and capricious; and (3) the Service failed to use the best available science. (*Id.* ¶¶ 81–97.) The parties each move for summary judgment on these issues. (*See* GMSJ; SMSJ; Guardians Opp'n to SMSJ & Reply ("G.Opp'n"), ECF No. 51; Serv. Opp'n to GMSJ & Reply ("S.Opp'n"), ECF No. 52.)

## IV. LEGAL STANDARD

The Service's decision not to list a species under the ESA is reviewed under the Administrative Procedure Act ("APA"). *Native Ecosystems Council v. Dombeck*, 304 F.3d 886, 901 (9th Cir. 2002). Courts "shall" set aside agency action, findings, or conclusions under the APA that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Although this is a deferential standard and courts should not "substitute [their] judgment for that of the agency," they must nonetheless engage in a "thorough, probing, in-depth review." *Citizens of Overton Park v. Volpe*, 401 U.S. 402, 415–16 (1971). Courts should "ensure that the agency considered the relevant factors and articulated a rational connection between the facts found and the choices made." *Greater Yellowstone Coal., Inc. v. Servheen*, 665 F.3d 1015, 1023 (9th Cir. 2011).

> [A]n agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the

agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Id.* (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). "Agency decisions deserve the highest deference when the agency is making predictions, within its area of special expertise." *CBD v. Zinke*, 900 F.3d 1053, 1067 (9th Cir. 2018) (internal quotation marks omitted) ("*Zinke*"). But even when an agency is operating in a field of its expertise, courts must disapprove agency decisions that lack a "substantial basis in fact," or in which its "reasoning is irrational, unclear, or not supported by the data it purports to interpret." *Id.*; *Nw. Coal. for Alts. to Pesticides v. EPA*, 544 F.3d 1043, 1052 n.7 (9th Cir. 2008).

An agency's "explanation must be evidenced from the listing decision itself," although an agency may incorporate a separate, fully-reasoned document by reference. *See Haaland*, 998 F.3d at 1068 (quoting *Zinke*, 900 F.3d at 1069). However, an agency may not raise new reasoning or provide new explanations in subsequent briefing; "an agency's action must be upheld, if at all, on the basis articulated by the agency itself, not post-hoc rationalizations." *Zinke*, 900 F.3d at 1069 (quoting *Greater Yellowstone*, 665 F.3d at 1027 n.4).

## V. MOTIONS FOR SUMMARY JUDGMENT

Guardians moves for summary judgment challenging the 12-Month Finding as arbitrary and capricious and violating the ESA. (GMSJ 1.) It requests that the Court set aside the Service's finding that the Joshua tree does not warrant listing as threatened under the ESA, and remand to the Service with directions to prepare a new finding that addresses these deficiencies. (*Id.*) The Service also moves for summary judgment on the basis that the record supports its determination that listing the Joshua tree as threatened is "not warranted." (SMSJ 1.)

Guardians contends the Service did not utilize the best available science as required by the ESA in making its determination because it irrationally disregarded relevant climate models and ignored key scientific findings. More specifically,

Guardians argues: (A) the best available science shows the Joshua tree is threatened by climate change, wildfire, habitat loss, low germination, slow growth, and limited capacity to migrate, and the Service disregarded these threats and their cumulative impact; (B) the Service's finding that YBR is not threatened throughout a "significant portion of its range" is inconsistent with the best available science and therefore contrary to law; and (C) the Service failed to evaluate threat Factor D, which considers whether the lack of existing regulatory mechanisms for addressing climate change threatens the Joshua tree. (*See* GMSJ.) The Service argues it considered the best available data and concluded none of the threats, individually or in combination, rendered the Joshua tree likely to become in danger of extinction in the foreseeable future, throughout all or a significant portion of its range. (SMSJ 1.)

A.     **Best Available Science**

The ESA requires the Service to make its listing determinations "solely on the basis of the best scientific and commercial data available" because of any one or a combination of the following five factors:

> (A) the present or threatened destruction, modification, or curtailment of its habitat or range; (B) overutilization for commercial, recreational, scientific, or educational purposes; (C) disease or predation; (D) the inadequacy of existing regulatory mechanisms; or (E) other natural or manmade factors affecting its continued existence.

16 U.S.C. § 1533(a)(1), (b)(1)(A); 50 C.F.R. § 424.11(c).

To comply with the ESA's "best available science" standard, the agency "cannot ignore available biological information [or] studies, even if it disagrees with or discredits them." *Zinke,* 900 F.3d at 1060 (quoting *San Luis & Delta-Mendota Water Auth. v. Locke*, 776 F.3d 971, 995 (9th Cir. 2014)). The agency must "thoroughly evaluate[] and incorporate[] the data" from contrary studies in "making its listing decision." *Kern Cnty. Farm Bur. v. Allen*, 450 F.3d 1072, 1081 (9th Cir. 2006). The ESA does not require that the data be conclusive or ironclad, *Alaska Oil & Gas Ass'n v. Pritzker*, 840 F.3d 671, 681 (9th Cir. 2016), and "[e]ven if the available

scientific and commercial data were quite inconclusive, [the agency] may—indeed must—still rely on it," *Sw. CBD v. Babbit*, 215 F.3d 58, 60 (D.C. Cir. 2000). To the extent there are uncertainties, the agency must "explain why the uncertainty . . . favors not listing" the species. *See Zinke*, 900 F.3d at 1073.

### 1. Best Available Science—Climate Change

The Service found that Joshua trees are not adversely affected by climate change to warrant listing them as threatened. (*See* SSR6939–40.) Guardians contends this conclusion is contrary to the best available science because every peer-reviewed Species Distribution Model ("SDM") predicts that climate change will cause substantial, widespread losses of suitable habitat for the Joshua tree. (GMSJ 11–14 (discussing five recent, available, sophisticated SDMs showing widespread loss of suitable Joshua tree habitat by the end of the century due to climate change, which the Service did not address).[4]) Guardians argues the Service disregarded these SDMs and other best available science and commercial data without a rational basis.

The Service admits it did not consider these SDMs but claims this was because the cited studies focus on specific portions of Joshua trees' range and could not be reliably extrapolated to the whole range. (SMSJ 9.) The Service argues the lack of range-wide demographic data for Joshua trees prevents it from validating such an extrapolation, making any resulting prediction unreliable. (*Id.*) The Service also claims it did not use these SDMs because they are based on short-term demographic monitoring, which does not capture the necessary long-term timeframe. (*Id.* at 9–10.)

The Service has discretion to determine what studies and models constitute the best available data. *See Zinke*, 900 F.3d at 1068. However, these post hoc rationalizations for disregarding the SDMs are not evidenced in the 12-Month Finding, as required. *Id.* at 1068–69 (explaining that an agency's reasoning must be evidenced in decision document itself). And although the 12-Month Finding

---

[4] The five SDMs discussed are Shafer 2001, Dole 2003, Cole 2011, Barrows 2012, and Sweet 2019. (*See* GMSJ 11–14; SSA7069–78 (References cited); Compl. ¶ 4 n.2 (citing Sweet 2019); *see also* AR7509–16 (Barrows 2012), 7965–77 (Cole 2011), 8201–10 (Dole 2003), 16634–48 (Sweet 2019).)

incorporates the SSA, the Service's explanations for disregarding these SDMs are not found there either. In its motion, the Service supports its explanations with citation to various studies found in the AR but does not identify anywhere in the 12-Month Finding or SSA where it considered the SDMs' contrary data. Indeed, a review of the SSA reveals the Service did not evaluate the SDMs, acknowledge their contrary data, or explain why the Service disregarded this apparently material data. *See id.* (stating that an agency cannot ignore available material studies, even if it disagrees with them, and must address contrary data).

Furthermore, the SSA appears to selectively rely on portions of these studies to support its non-listing determination despite failing to address their contrary findings. For instance, the Service relies on Cole 2011 for its data on historical distribution, seedling survival, and demographics, (SSA6972, 6981, 6989–90), but ignores the rest of that study, including the study's predictions regarding significant climate-change-driven habitat loss, (*see* AR7971 (Cole 2011, projecting "severe decline" in climactically suitable habitat by 2070 to 2099, "perhaps to as little as 10% of its current range")). The Service also appears to rely on Barrows 2012 for its conclusion that potential "climate-change refugia," or suitable future habitat, will be available, but merely notes without discussion the study's prediction of a 90% loss in habitat due to climate change. (*See* SSA7051 (explaining that "finer-scale modelling . . . indicated there may be some areas of climate-change refugia . . . so we assume . . . Joshua trees will continue to persist in these areas"); SSA7001–02, 7014 (noting 90% habitat loss without analysis).) Selective reliance like this, without explanation, is arbitrary and capricious. *See Zinke*, 900 F.3d at 1069 ("By failing to consider the [study's contrary evidence], [the Service] acted in an arbitrary and capricious manner.").

To support its omission of these studies' data, the Service also cites one paragraph in the SSA that mentions general criticisms of SDMs. (SMSJ 9 (citing SSA7036 (discussing criticisms of studies from 2003 and 2009)).) As Guardians note,

these criticisms mostly predate the studies at issue here. (*See* GMSJ 14 n.6 ("[T]hese purported critiques pre-date the most sophisticated SDMs by [Cole 2011, Barrows 2012, and Sweet 2019].").) Regardless, the Service fails to direct the Court to any section of the SSA that discusses the above newly-raised concerns regarding extrapolation or validation and it fails to explain its selective reliance on these studies. (*See* SMSJ 9–15.) Consequently, the Court finds that the Service selectively relied on beneficial data and failed to consider and evaluate the contrary data in the SDMs or adequately explain, in the SSA or 12-Month Finding, why they were disregarded. In this failure, the Service acted in an arbitrary and capricious manner. *See Zinke*, 900 F.3d at 1069.

This is not the Service's only weakness concerning climate change impacts. In concluding that climate change will not affect Joshua trees at a population- or species-level, the Service relies on speculation and unsupported assumptions. For instance, the Service states as fact that 138ºF is the upper "appropriate temperature range" for the species to survive, (SSA6992), and notes it cannot determine a maximum temperature in an environmental setting, (SSA7037), but still appears to reason, based on the upper temperature range of 138ºF, that the species as a whole will tolerate increased environmental temperatures from climate change, (*see* SSR6939). To support the 138ºF tolerance level, the Service cites a carbon dioxide laboratory study from 1983 in which detached Joshua tree leaves were placed in hot water for an hour and then examined for heat damage. (SSA6992 (citing Smith 1983, available in the record at AR12833, 12838).) The Service does not explain how leaf cell damage from hot water supports species tolerance at increased environmental temperatures in drought conditions, or how an isolated leaf can be extrapolated to the trees' or the species' responses. As the Service fails to articulate a rational connection between the facts and the Service's conclusion that Joshua trees will be able to survive, reproduce, and persist at 138ºF, the Court finds this conclusion unsupported and, therefore, arbitrary and capricious. *See Greater Yellowstone*, 665 F.3d at 1023.

Another example is the Service's contention that Joshua trees will be able to migrate to climate refugia when its current habitat contracts. (SMSJ 10–13.) But the study on which the Service relies for its historical distribution also provides that the species has an "extremely limited" capacity to migrate. (AR7973 (Cole 2011).) This study reveals that Joshua trees have migrated, at most, approximately 2m or 6.5ft[5] per year over the last 11,700 years, making meaningful migration unlikely. (*See id.*) Further, the Service fails to acknowledge or consider reports that much of the identified "refugia" has already burned. (*See* GMSJ 17 (citing AR5127 (National Park Service's Partner-Review of SSA, which notes "50% of . . . suitable habitat has already been impacted by wildfire")).) The Service contends its conclusion regarding migration is supported by studies showing: (i) pollinator moths have moved with the trees in the past, (ii) strong seedling recruitment has been found in Joshua Tree National Park, and (iii) increased atmospheric carbon dioxide from climate change may benefit the species' survival. (*See* SMSJ 11 (citing AR16058 (moths), AR7515 (seedlings), AR19635–44 (carbon dioxide).) None of this explains how a species that is historically "extremely limited" in its ability to migrate will somehow save itself from the projected "massive declines" in suitable habitat before the turn of the century. (*See* AR5127.)

Ultimately, the Service's conclusion that the Joshua tree will be able to migrate to climate refugia and survive beyond its contracting habitat appears inadequately supported and counter to the data on which it relies. *See Zinke*, 900 F.3d at 1067 (finding arbitrary and capricious the conclusion that a species would be able to migrate to more suitable habitats when it had historically been incapable); *Greater Yellowstone*, 665 F.3d at 1023 (stating that an agency must articulate a rational connection between the facts found and the conclusions made).

For these reasons, the Service's determination that climate change does not threaten Joshua trees so as to warrant listing is arbitrary and capricious.

---

[5] A migration rate of 6.5ft per year permits Joshua trees to migrate about 500 feet by the year 2200.

### 2. Best Available Science—Wildfire

The Service concluded that the current and future risk of wildfire does not pose a significant threat to Joshua trees. (*See* SSR6937–39.) Guardians contends the Service arbitrarily dismissed and downplayed the fire threat from invasive grasses. (*See* GMSJ 18–21.) Guardians argues the Service underrepresented the threat from fire and that the record contradicts the Service's conclusion that "more frequent, larger fires will only affect" an insignificant portion of the population. (*Id.* (citing AR14840–41, 14845–50 (Service experts' findings), AR0956–59 (2017 Rapid Assessment on fire risk), and AR5100–01, 5126–28, 5430–31 (peer- and partner-review reports criticizing the Service's underrepresentation of fire risk)).) The Service's conclusions regarding fire threat appear disconnected from the data on which they rely, and therefore underrepresent the threat from fire in several ways.

First, regarding invasive grasses, the Service relies on Bureau of Land Management ("BLM") invasive grass models to evaluate Joshua trees' future vulnerability to fire. (SSA7033, 7055.) The BLM found that "even *trace amounts* of invasive grasses can effectively alter the historical fire regime. (AR8070–71 (BLM study) (emphasis added).) Despite this, the Service concluded that invasive grasses would need to be a much higher amount of ground cover—at least 15–25% or even 25–45%—to alter the fire regime and create vulnerabilities in Joshua trees. (*See* SSA7033–35, 7056–57.) The Service also discusses how invasive grasses are accelerating and fueling larger and more severe wildfires. (*See* SSA7049, 7055.) Yet, it then concludes the fire threat is limited because the Service expects the historical trend of infrequent fire recurrence to continue in the coming century. (*See* SSA7055–57 (discussing a 300–500 year fire frequency historical trend).) The Court recognizes that acceleration of fire threat is not necessarily inconsistent with maintenance of historical fire frequency, but the Service fails to explain how the fire threat can be both accelerating and maintaining its return frequency. These conclusions do not follow from the data on which they purport to rely and the

1  Service's failure to explain its reasoning on these points precludes "meaningful
2  judicial review." *See Zinke*, 900 F.3d at 1069.

3  Another apparent contradiction concerns the Service's conclusions of Joshua trees' fire resiliency. The Service expressly finds that Joshua trees "are generally not well adapted to fires, with resulting high mortality rates, particularly those plants in smaller size classes." (*See* SSA6999–7000 ("[T]he high mortality recorded in this study is consistent with high mortality documented in other studies, including 90 percent mortality 6 years after a fire in Joshua Tree National Park and 64–95 percent mortality . . . between 1–47 years after" other California fires).) At the same time, the Service contends that Joshua trees have shown "fire resiliency" by resprouting in burned areas and that adult trees can "quickly re-establish" after a fire. (DMSJ 15.) The study on which the Services relies does not actually go this far; rather, in considering adult trees "that sprout after burn injury," it finds *those* trees "are able to quickly reestablish as reproductive adults." (*See* AR8197 (DeFalco 2010).)[6] The Service does not discuss what ratio of adult trees are likely to sprout after burn injury compared to those that will not, nor does it explain how the documented high mortality rate figures into that ratio. Thus, the "reasoning is . . . not supported by the data it purports to interpret." *See Nw. Coal.*, 544 F.3d at 1052 n.7.

19  The Service contends that fire threat studies are complex and often conflicting so the Court should defer to the Service. (S.Opp'n 16–17.) The Court acknowledges that numerous complex studies inform the Service's non-listing decision and the Court does not substitute its own judgment for the Service's. However, the Court may not defer to the Service when, as is the case here, its conclusion does not follow from the cited facts, nor may the Court supply a reasoned explanation when the Service has not provided one. *See Nw. Coal.*, 544 F.3d at 1048, 1052 n.7.

---

[6] Notably, the Service criticizes Guardians for extending the DeFalco 2010 study beyond its data. (*See* DMSJ 15–16.)

1   As the Service fails to articulate a rational connection between its fire threat
2   conclusions and the data on which it purports to rely, the Court find its conclusions
3   arbitrary and capricious. *See Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43 (stating that
4   an agency's determination is arbitrary and unlawful when it fails to articulate a
5   rational connection between the record and the decision).

### B.   YBR—Significant Portion of Range

"A species is . . . threatened if it is 'likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range.'" *Haaland*, 998 F.3d at 1063. The Service identified "biologically significant" threats to the western portion of YBR's southern population[7] from wildfire and habitat loss due to urban development. (SMSJ 6–7 (citing SSR6951–52).) However, the Service concluded that this area of concentrated threats "is not significant" and therefore YBR "is not in danger of extinction or likely to become so" in "any significant portion of its range." (SSR6952.)

The Service created two predictive increased-temperature scenarios to determine future threats to the species in a given range. The first scenario (Scenario I) utilized an increase of 1–2ºC, generally, and the second (Scenario II) utilized an increase of 3ºC, generally. (SSA7041.) In YBR's southern population ("YBR South"), Scenario I resulted in a 21.7% loss of suitable habitat; Scenario II resulted in a 41.6% loss. (SSA7047.) This represents 13.8% and 26.3% of the total range, respectively. (*Id.*) The Service explains it found this loss insignificant because, although it will occur throughout an area of approximately 3.7 million acres, the biologically significant threat from wildfire and urban development would occur only at the perimeter. (SMSJ 24–25 (citing SSA7001, 7050; SSR6952).) These explanations are rationally connected to the underlying data and found in the SSA. Although the Court finds it difficult to accept that a 41.6% loss of southern range

---

[7] The Service divided the range into six regions, with YBR classified as either "North" or "South." (*See* SSA6975.)

habitat can be "insignificant," the Service has reasonably explained how it reached this conclusion and the Court will not substitute its judgment.

However, the Service also asserts this 41.6% loss is "no[t] significant" because it is not a "complete[] loss," as the species will continue, "albeit at lower densities." (S.Opp'n 20–21 (citing SSA7050–52).) But listing a species as threatened does not require a complete loss: "The Service need not wait until a species' habitat is destroyed to determine that habitat loss" may endanger the species. *Alaska Oil*, 840 F.3d at 683. Therefore, to the extent the Service rests its finding on the absence of a "complete loss," the Court finds its conclusion not in accordance with established law. *See id.* at 683–84.

Finally, and most critically here, when the Service disregarded the SDMs discussed above, it also ignored those studies' forecasted habitat decline, including projected habitat loss in YBR South. (*See* GMSJ 23–25.) Several of those studies projected the nearly complete loss of YBR South by the end of the century. (*See* G.Opp'n 23 (discussing the 90 to 99.8% projected loss of YBR South habitat in Cole 2011, Barrows 2012, and Sweet 2019).) As the Service failed to address the SDMs' significant projected habitat loss, it also necessarily failed to rationally explain whether that loss constituted a "significant portion of the range."

The Service failed to consider the SDMs or explain why they were disregarded, and this failure renders the Service's conclusion that YBR is not threatened throughout a significant portion of its range arbitrary and capricious.

C. **Factor (D)—Existing Regulatory Mechanisms**

The Service must make its listing determinations based on any one or combination of the five threat factors, the fourth of which is "(D) the inadequacy of existing regulatory mechanisms." 16 U.S.C. § 1533(a)(1)(D).

Guardians argues the Service must evaluate Factor D independently, and that the Service failed to consider the threat posed to Joshua trees from inadequate existing regulatory mechanisms addressing climate change. (GMSJ 25.) The Service contends

it considered existing regulatory mechanisms and that "existing regulations can only be inadequate where they are insufficient to militate a species'[s] slide to extinction." (SMSJ 21–22.) Because the Service concludes Joshua trees are not sliding into extinction, it contends existing regulatory mechanisms necessarily cannot be inadequate. (SMSJ 20–22; S.Opp'n 22.)

Regardless of which interpretation of Factor D is correct, the Service *did* consider existing regulatory mechanisms and protecting Joshua trees. (*See* SSR6942–43; SSA7006–07.) The regulatory mechanisms include federal, state, and local protections, and nothing suggests the Service's conclusion that these mechanisms are acting as intended is unreasonable. Still, Guardians is correct that none of the regulations cited pertains specifically to *climate change*. (*See id.*) In any event, the Service's conclusion that existing regulatory mechanisms are adequate is premised on its determination that threats to Joshua trees do not warrant its listing. As discussed above, the Court finds this determination arbitrary and capricious and therefore remands for reconsideration. On remand, the Service should consider the adequacy of existing regulatory mechanisms *pertaining to climate change*.

### D. Conclusion—Motions for Summary Judgment

In summary, the Court **GRANTS** Guardians's Motion for Summary Judgment, **DENIES** the Service's Motion for Summary Judgment, sets aside the Service's 12-Month Finding as arbitrary, capricious, and contrary to the ESA, and remands to the Service for reconsideration in light of the foregoing. Specifically, the Court finds:

(i) the Service's climate change conclusions are arbitrary and capricious because the Service disregarded material data (the SDMs) and failed to explain why;
(ii) the Service's findings regarding threats posed by climate change and wildfire are unsupported, speculative, or irrational; and
(iii) the Service's conclusion that Joshua trees are not threatened in a significant portion of their range is arbitrary and capricious.

The Court need not and does not determine whether Factor D must be considered independently or may be considered in conjunction with other statutory

factors. Nevertheless, on remand, the Service should consider the adequacy of existing regulatory mechanisms regarding *climate change*.

## VI. AMICUS MOTION

Proposed Amicus QuadState moves for leave to file an amicus brief in support of the Service's Motion for Summary Judgment. (*See* Mot.) It attached its proposed brief to its Motion. (*See* Proposed Amicus Br., ECF No. 47-2.) QuadState is an interstate joint powers organization representing the interests of its seven local government and one city members throughout the range and distribution of the Joshua tree. (Mot. 2). QuadState asserts it has an interest here because setting aside the 12-Month Finding—and presumably the potential listing of the Joshua tree as threatened—would impede its members' ability to provide public services and would require them to expend scarce resources. (*Id.* at 3.) Quadstate's Motion is unopposed.

"The district court has broad discretion to appoint amici curiae." *Hoptowit v. Ray*, 682 F.2d 1237, 1260 (9th Cir. 1982), *abrogated on other grounds by Sandin v. Conner*, 515 U.S. 472 (1995). "There are no strict prerequisites that must be established prior to qualifying for amicus status; an individual seeking to appear as amicus must merely make a showing that his participation is useful to or otherwise desirable to the court." *In re Roxford Foods Litig.*, 790 F. Supp. 987, 997 (E.D. Cal. 1991) (citation omitted). Courts have granted amicus status "when the amicus has unique information or perspective that can help the court beyond the help that the lawyers for the parties are able to provide." *Cmty. Ass'n for Restoration of Env't v. DeRuyter Bros. Dairy*, 54 F. Supp. 2d 974, 975 (E.D. Wash. 1999) (citing *Miller-Wohl Co. v. Comm'r of Labor & Indus.*, 694 F.2d 203, 204 (9th Cir. 1982)). Although some courts disfavor amicus participation, this Court has generally found it preferable to err on the side of permitting such briefs. *See Duronslet v. County of Los Angeles*, No. 2:16-cv-08933-ODW (PLAx), 2017 WL 5643144, at *1 (C.D. Cal. Jan. 23, 2017).

The majority of QuadState's members "own public lands that are within the range of the Joshua tree." (Mot. 2.) QuadState maintains that the existing parties to

this litigation do not adequately represent the interest of local governments, which is to ensure local governments "retain authority to continue providing essential services to [their] constituents." (*Id.* at 8.) QuadState members' interests may be affected by a decision in this case as local governments often bear the burden of managing natural resources within their jurisdictions. QuadState members are also responsible for ensuring compliance within those jurisdictions of any regulations imposed related to an ESA listing. They therefore have interests that may be affected by the outcome of the Court's decision in this case and a unique perspective beyond those of the parties.

Accordingly, QuadState's Motion for Leave to File an Amicus Brief is **GRANTED**. (ECF No. 47.) The Court has considered the proposed brief to the extent found useful.

## VII. CONCLUSION

For the reasons discussed above, the Court **GRANTS** Guardians's Motion for Summary Judgment, (ECF No. 42), **DENIES** the Service's Motion for Summary Judgment, (ECF No. 46), and **GRANTS** QuadState's Motion for Leave to File an Amicus Brief, (ECF No. 47.) The Court **SETS ASIDE** the Service's 12-Month Finding as arbitrary, capricious, and contrary to the ESA, and **REMANDS** to the Service for reconsideration pursuant to the above.

**IT IS SO ORDERED.**

September 20, 2021

_____
**OTIS D. WRIGHT, II
UNITED STATES DISTRICT JUDGE**